# EXHIBIT 3

Opinion and Order, N.D. Indiana 2:19-cv-00337-PPS-JEM
(Apr. 14, 2021) [DE 48]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| SIERRA CLUB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CAUSE NO. 2:19-CV-337-PPS-JEM |
| | ) | |
| BP PRODUCTS NORTH AMERICA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION AND ORDER</u>

This Clean Air Act case involves Plaintiff, Sierra Club, who is bringing a citizen suit to enforce emission requirements that apply to Defendant BP's Whiting, Indiana oil refinery. This case was previously assigned to Judge Theresa Springmann. When Sierra Club moved for partial summary judgment for the violations alleged in Counts II and III of the complaint regarding an emission limit and retesting requirement for three boilers and their associated stacks, Judge Springmann referred the matter to Magistrate Judge John E. Martin for a report and recommendation. Judge Martin recommended that Sierra Club's motion be granted, and BP promptly objected. After pending for some time, the case was then reassigned to me, and I held an oral argument on this matter on April 6, 2021.

In summary, after a de novo review, I agree with Judge Martin and find that Sierra Club has shown there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law as to emissions violations at three of BP's stacks

and the retesting requirement as well.  Therefore, the objections [DE 30] will be overruled and the Report and Recommendations [DE 29] are accepted and adopted.

<u>**Factual and Procedural Background**</u>

Before I turn to the legal backdrop of this case, let's first look at the setup of BP's Refinery, so the terms used in this order are (at least somewhat) understandable.  There are five boilers at issue in the plant (boilers 31-34 and 36), and they produce steam-generated electricity needed by various other units throughout the refinery.  [Compl., DE 1 at 6, ¶ 32.][1]  Each boiler has a conventional burner, a direct-fired duct burner, and a select catalytic reduction system to control the emissions of nitrogen dioxide.  *Id.*  The combined emissions of air pollution from each individual boiler, its burners, and its nitrogen oxide control system are released into the atmosphere through stacks 503-01 through 503-05.  [*Id.* ¶¶ 32, 26.]  To operate this refinery, BP has to obtain and comply with a Title V operating permit, which provides for a number of restrictions on operations as well as emissions requirements.

On June 30, 2020, Judge Springmann entered an order referring Sierra Club's motion for partial summary judgment to Magistrate Judge John E. Martin for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  [DE 27.]  Under section 636(b)(1)(B), a district court judge may designate a magistrate judge to conduct hearings and submit proposed findings of fact and recommendations for disposition of

---

[1] There are a lot of documents, exhibits, memoranda, and opinions cited in this order.  For the sake of simplicity, every citation is to the docket entry number and the page numbers are the blue docket entry page references at the top of each docket entry.

dispositive motions (like a motion for summary judgment).  The referral to Judge
Martin has greatly extended these proceedings with little upside since the review of
Judge Martin's decision is de novo anyway.

In a nutshell, Judge Martin found that, under the Clean Air Act operating permit
for the Whiting Refinery, emissions of particulate matter ten microns or smaller in
diameter (referred to as "$PM_{10}$") from the refinery's boiler stacks "shall not exceed"
0.010 pounds per million British thermal units ("lb/mmBtu").  [R&R, DE 29, at 1.]  To
show it is in compliance with this requirement, BP has to periodically perform
emissions tests using specific test methods approved by the U.S. Environmental
Protection Agency.  [*Id.* at 1-2.]  If any of the test results "exceed the level specified in"
BP's operating permit, a "retest to demonstrate compliance" must be performed within
180 days of the failed test.  [*Id.* at 2.]

Judge Martin found that between August 3, 2015 and October 9, 2018, BP
conducted 9 emissions tests of the three boiler stacks at issue, and BP received 8 test
results above the 0.010 lb/mmBtu $PM_{10}$ limit.  [*Id.* at 2.]  BP reported the test results to
the Indiana Department of Environmental Management ("IDEM"), which eventually
determined that 8 of the tests demonstrated noncompliance with the 0.010 lb/mmBtu
$PM_{10}$ emission limit (one test was inconclusive), and the IDEM sent formal notices to BP
informing it that all 8 tests demonstrated BP violated the permit limit.  [DE 1 at 16-17;
DE 18 at 15.]

Judge Martin also found that, despite the permit's retesting requirement, BP did not retest the stacks within 180 days after several of these tests. [DE 29 at 2.] Sierra Club set forth evidence that BP violated the requirement to retest within 180 days after 6 of the failed tests, and IDEM formally notified BP about 4 of these failures to retest. [DE 18 at 16-17.] Thus he found it proper to grant Sierra Club's motion for partial summary judgment as to Counts II and III of the complaint which allege that BP violated the emission limit and retesting requirements as to three of the boiler stacks (numbers 503-01, 503-02, and 503-05).[2] The remaining count in the complaint, Count I, deals with different emissions limits from the boilers, and will remain pending as Sierra Club did not seek summary judgment on Count I. [DE 1 at 22-26.]

I "may accept, reject, or modify, in whole or in part," the magistrate judge's report. 28 U.S.C. § 636(b)(1). Parties have fourteen days after being served with the magistrate judge's report to file written objections to the proposed findings and recommendations. *Id.* As I noted above, "[a] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.*; *see Rajaratnam v. Moyer*, 47 F.3d 922,

---

[2] Sierra Club states it is not moving for summary judgment on violations of the 0.010 lb/mmBtu limit or failure to retest at "Boiler Stacks 503-03 and 503-05 stacks," which were also alleged in Counts II and III. The second number must be a typographical error, as I believe Sierra Club meant it is not seeking summary judgment for violations of the boiler stacks 503-03 and 503-04. Sierra Club states it expects to be able to prove the violations at these two additional stacks at trial. [DE 18 at 8 n.1.] Sierra Club made clear at oral argument that it did not move for summary judgment on the two additional stacks because IDEM did not issue notices of violation for those emission tests.

924 n.8 (7th Cir. 1995) (holding de novo review requires a fresh look at issues to which an objection has been raised).

BP filed a motion for review of Judge Martin's decision and lodged four main objections to his opinion: (1) the finding that Sierra Club has established by admissible and undisputed evidence the necessary elements of injury, traceability, and redressability required to prove standing; (2) the finding that section 7604(f)(4) of the Clean Air Act moots the need to address whether an alleged violation is more specifically defined by another subpart as an "emission standard or limitation"; (3) the finding that BP's defense that the test method for demonstrating compliance with the $PM_{10}$ emission rate is biased is actually a challenge to the test method itself and therefore not reviewable in this action; and (4) the finding that BP failed to timely conduct retests of the three boiler stacks at issue.  [DE 30 at 3.]  Each objection will be addressed in turn in the second half of this opinion.  But first, I'll look at whether Sierra Club has shown it is entitled to judgment as a matter of law on Counts II and III for the emissions requirement and retesting requirement for the three stacks at issue.

## Discussion

### I.    Sierra Club Is Entitled To Judgment as a Matter of Law on The Three Stacks Violating the Emission Limit and Retesting Requirement

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A genuine dispute of material fact exists when "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Let's start by looking at the legal background of a citizen suit under the Clean Air Act first, to establish some legal footing before getting into the minutiae of this case. The Clean Air Act's citizen suit provision authorizes "any person," after providing 60 days' notice, to commence a civil action on his own behalf "against any person . . . who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of . . . an emission standard or limitation under this chapter[.]" 42 U.S.C. § 7604(a). To establish liability in a citizen suit under the Clean Air Act, Sierra Club must demonstrate that BP has violated "an emission standard or limitation" defined by the statute. 42 U.S.C. § 7604(a)(1). Qualifying limitations include any "condition or requirement of a permit under part C of subchapter I (relating to significant deterioration of air quality)" § 7604(f)(3), *or* "any other standard, limitation, or schedule established under any permit issued pursuant to subchapter V or under any applicable State implementation plan approved by the Administrator . . . ." 42 U.S.C. § 7604(f)(4).

This gets a little tricky when looking at the permit in this case, and the alleged emission violations, but let's dive in. Sierra Club argues that Condition D.24.4(b)(2) of the Whiting Refinery's current Title V operating permit is an emission standard or limitation under section 7604(f)(4), and that the stack test results BP reported to IDEM, showing the three stacks violated the 0.010 lb/mmBtu $PM_{10}$ limit during the eight tests,

6

constitute the basis for this suit.  After spending a great deal of time reading the permit and listening to the parties' oral argument, I agree with Sierra Club that the permit itself requires that each boiler, as measured at each stack at issue, when tested by the method required by the permit, must result in emissions of $PM_{10}$ not to exceed 0.010 lb/mmBtu.

The exact language of the permit is important, and, while tedious to get through, needs to be included here:

D.24.4 Prevention of Significant Deterioration [326 IAC 2-2] and Emission Offset [326 IAC 2-3] Minor Limits

In order to render 326 IAC 2-2 and 326 IAC 2-3 not applicable, ***the Permittee shall comply*** with the following for No. 3 Stanolind Power Station Boiler #31 and Duct Burner #31, Boiler #32 and Duct Burner #32, Boiler #33 and Duct Burner #33, Boiler #34 and Duct Burner #34, and Boiler #36 and Duct Burner #36, ***as measured at Stacks 503-01, 503-02, 503-03, 503-04, and 503-05:***

(a) Pursuant to SSM 089-25484-00453, the Permittee shall comply with the following:

.      .      .      .      .

(2) The firing rate (total) at the five (5) boilers shall not exceed 24,303,535 mmBTU per twelve (12) consecutive month period, with compliance determined at the end of each month.

(3) The firing rate (total) at the five (5) duct burners shall not exceed 1,732,947 mmBTU per twelve (12) consecutive month period, with compliance determined at the end of each month.

.      .      .      .

(b) Pursuant to SSM 089-25484-00453 and as revised by SSM 089-32033-00453, ***the Permittee shall comply with the following***:

7

(1) The emissions of PM shall not exceed 0.012 pound per million BTU.

(2) **The emissions of $PM_{10}$ shall not exceed 0.010 pound per million BTU**.

.                    .                    .                    .

Compliance with the limits on annual firing rates and the $NO_x$, VOC, $SO_2$, CO, PM and $PM_{10}$ emissions limits, in conjunction with the emissions limits at other units at this source, shall ensure that the net emissions increases, including fugitive emissions, for $NO_x$, VOC, $SO_2$, CO, PM and $PM_{10}$ for the WRMP project remain below the significant, rendering 326 IAC 2-2, 326 IAC 2-1.1-4 and 326 IAC 2-3 not applicable for these pollutants.

[DE 18-1 at 28-29 (emphasis added.]  BP's counsel explained at the hearing this provision relates to something called "the new source review" and that in order to avoid another costly review process, the permit provides a "synthetic permit limit," which is a maximum amount of emissions, where under no circumstances can BP exceed that number.

Importantly for purposes of summary judgment, BP does not dispute that eight tests showed that the 0.010 lb/mmBtu limit for $PM_{10}$ emissions was exceeded.  Rather, BP tries an end run around the obvious violations by contending the limit is not enforceable by itself.  BP also makes some throwaway arguments that the test the permit requires BP to use is unfair, and that BP has applied for an amended permit. Frankly, all of these arguments are designed to obscure the basic fact that BP repeatedly violated the emissions limit set out in the plain language of the permit.

The crux of BP's argument is that  Sierra Club cannot enforce the 0.010 lb/mmBtu $PM_{10}$ limit (in permit section D.24.4(b)(2)), because BP's only enforceable

PM$_{10}$ limit for the boiler stacks is an "annual PTE limit."  [DE 30 at 1-2.]  In other words,

BP contends one must read subsection (b) of the permit, which provides for the

emissions of PM$_{10}$ in conjunction with subsection (a), which establishes the maximum

fuel/firing rate at which the burners could be running.  BP contends Condition D.24.4

limits the boilers' particulate matter emissions as a Potential to Emit ("PTE") limit

(measured in <u>tons per year</u>), imposed as part of Indiana's implementation of the Act's

Prevention of Significant Deterioration ("PSD") permitting program. [DE 24 at 7 (citing

42 U.S.C. § 7410(a)(2)(C); 42 U.S.C. § 7470-7479).  BP believes compliance with this PTE

limit involves two factors: (1) the emissions rate (which is expressed as mmBtu); *and* (2)

the firing rates of the five units combined (expressed as mmBtu per 12 consecutive

months).  When these are multiplied together, the argument goes, this establishes the

total emissions limit in tons per 12 months. [DE 30 at 8-9.]  Doing the math then leads to

a total emission limit of 130.18 tons per year for all five boiler stacks combined, which

BP facilely claims it met.  [DE 24-3 at 4.]  In other words, BP doesn't think it violated the

permit at all, because it doesn't believe that exceeding the 0.010 lb/mmBtu emissions

for PM$_{10}$ results in any one test matters.

   Specifically, BP contends that the 0.010 lb/mmBtu emission rate is not a stand-

alone limit for the refinery. [DE 30 at 8.]  It believes only section 7604(f)(3) applies in this

case and that Permit Condition D.24.4 (which addresses the emissions limits for the

stacks within the condition), is generally the applicable "condition or requirement," but

the rules *within* Condition D.24.4 (including the emissions limit of 0.010 lb/mmBtu)  *do*

*not* establish "conditions or requirements" under section 7604(f)(3) that Sierra Club can base their lawsuit upon.

Magistrate Martin rejected this exact argument.  First, he correctly concluded that this "strained interpretation" of the permit itself does not fly. [DE 29 at 6.]  I concur that the subparts in Condition D.24.4 are equally enforceable, "so the argument that Condition D.24.4 itself is a 'condition or requirement' while the actual rules [under it] are not is nonsensical." [DE 29 at 7; Permit, DE 18-1 at 29.]  I have carefully reviewed the plain language of the operative permit, and it provides that the $PM_{10}$ emissions "*measured at Stacks* 503-01, 503-02, 503-03, 503-04, and 503-05 . . . shall not exceed 0.010 pound per million BTU." [DE 18-1 at 28-29 (emphasis added).]  What is plainly meant by the phrase "measured at Stacks" is that no test taken at any of the enumerated stacks can exceed 0.010 pound per million BTU.  Moreover, the permit states that "[n]oncompliance with any provisions of this permit is grounds for enforcement action [and] . . . constitutes a violation of the Clean Air Act."  [*Id.* at 22.]  The fact that Condition D.24.4 also includes additional limits relating to the maximum fuel rate or firing rate is neither here nor there.

To the extent that BP supports its argument that the only enforceable limit is the annual PTE limit under 42 U.S.C. § 7604(f)(3), this argument is also a loser.  Judge Martin appropriately recognized that the Seventh Circuit has very clearly "rejected this view," and that the 0.010 lb/mmBtu limit is also actionable under section 7604(f)(4). [DE 29 at 7 (citing *McEvoy v. IEI Barge Servs., Inc.*, 622 F.3d 671, 677-78 (7th Cir. 2010) ("The

fact that the different subparagraphs of § 7604(f) may overlap to a degree is no reason to reject the natural reading of a statute . . . This reading of [§ 7604(f)(4)] does not interfere with citizen suits based on permit terms; so long as a plaintiff has identified a standard, limitation, or schedule under any permit issued pursuant to 42 U.S.C. §§ 7661-76661f, then that route is also available.").

For all of these reasons, I agree that the emission limit of 0.010 lb/mmBtu $PM_{10}$, in the Permit Condition D.24.4(b)(2), does indeed provide a basis for a citizen suit under 42 U.S.C. § 7604(a)(1). Sierra Club has submitted uncontroverted evidence that BP violated this testing requirement when it received 8 test results above the 0.010 lb/mmBtu $PM_{10}$ limit between August 3, 2014 and October 9, 2018. And "the Clean Air Act imposes strict liability from the first day of the offense," so nothing more is needed at this stage of the litigation, to grant summary judgment on the basis of liability. *Sierra Club v. Khanjee Holding*, 655 F.3d 699, 708 (7th Cir. 2011). The appropriate award of civil damages and fees is of course something that will need to be determined down the road.

Sierra Club has also showed there is no genuine dispute of material fact that BP failed to timely conduct the required retests. The retesting requirement is enforceable under the citizen suit provision, which defines an "emission standard or limitation" to include "any other standard, limitation, or schedule established under any permit issued pursuant to subchapter V . . . [and] any permit term or condition . . . in effect under this chapter . . . ." 42 U.S.C. § 7604(f)(1), (4). The retesting requirement falls both

under the definition of a "schedule" made pursuant to BP's permit and a "permit term or condition."

BP's permit provides that when "the results of a stack test . . . exceed the level specified in any condition of this permit . . . [a] retest to demonstrate compliance shall be performed no later than one hundred eighty (180) days after the date of the test." [DE 18-1 at 26.]  BP's permit requires BP to report the results of all stack tests to IDEM within 45 days. [DE 18-1 at 25.]  Sierra Club set forth evidence in its motion for partial summary judgment that BP failed to conduct timely retests after six of the tests. [DE 18 at 16.]

On August 1, 2017, IDEM formally notified BP in writing that it violated the requirement to retest within 180 days of the October 21, 2015 stack test at stack 503-05, and the January 28, 2016 stack test at stack 503-02 [DE 18-1 at 39-40]; on December 15, 2017, IDEM formally notified BP in writing that it violated the retest requirement for the November 1-2, 2016 and November 2-3, 2016 stack tests at stacks 503-02 and 503-05 [DE 18-1 at 44-45].  While IDEM did not issue formal notices of violation for failure to retest after the October 8, 2018 test at stack 503-01 or the October 9, 2018 test at stack 503-02, a search of IDEM's public records resulted in finding no subsequent retesting of either stack. [Sanghuyun Lee Dec., DE 18-1 at 52-55.]  Thus Sierra Club set forth evidence that BP failed to conduct timely retests after six of the tests.  [DE 18 at 16.]  Judge Martin found as an undisputed material fact, that "[i]n several cases, BP did not retest the stacks within 180 days." [DE 29 at 2.]

BP argues for the first time that retests were not required because BP "had a reasonable belief" that the November 2016 tests (in which it used an alternate testing methodology) established compliance up until the point IDEM issued an enforcement action letter in December 2017 (after the 180 day retesting window had closed). [DE 30 at 21.] This novel argument is waived since it was not raised before.  But even if I were to consider it, as discussed later in this opinion, I reject the argument that BP can use the November 2016 tests (conducted with an alternate test) to show compliance with its permit.  Additionally, there is communication from IDEM showing it did not condone use of an alternate test.  There is an IDEM email dated August 14, 2017, telling BP that "the stack tests performed on Boilers 32 and 36 from November 1-3, 2016 had results of noncompliance" and BP's alternate method "was not viewed as acceptable for the PM tests."  [DE 32-1 at 10.]

BP also contends it did not violate the retesting requirement because IDEM has the discretion to extend any deadline for retesting. [DE 30 at 21.]  Be this at it may, there is nothing in the record suggesting that IDEM granted any such extension of the deadlines to retest.  And there is evidence to the contrary; IDEM sent enforcement letters and notices of violation telling BP it failed to timely perform retests within 180 days as required by Condition C.19 of the operating permit. [DE 18 at 16-17.]

BP criticizes Judge Martin for impermissibly "treat[ing] Sierra Club's cited IDEM enforcement documents [DE 18-1 Exs. 5-7 at 34-46] as facts" because the notices of violation were not final or dispositive agency actions. [DE 30 at 21.]  I see nothing

wrong with Judge Martin's reliance upon the IDEM enforcement documents, and I'm
not sure what other proof Sierra Club would have relied upon to establish the retesting
violations, to be quite honest.  BP has not offered any other evidence showing that
IDEM was incorrect and that it did in fact do the retesting, or any evidence showing
that IDEM might change its mind in the future.  Therefore, Judge Martin's reliance on
IDEM's notices of violation is justified, and I agree with his finding that BP violated the
retesting requirement as to the three stacks at play in this motion for partial summary
judgment.

## II.    BP's Objections to the Magistrate's Findings and Recommendations Fail

I will now turn my attention to BP's particular arguments on the objections to
Judge Martin's opinion. They involve the issues of (1) standing and (2) whether the
EPA's testing method at issue in this case  — the so called "Method 202 " — can be
challenged in this case.

### A.    Standing

In his report and recommendation, Judge Martin concluded that "BP has not
raised a material issue of fact as to standing." [DE 29 at 6.]  In its current objections, BP
largely does not address the arguments made before Judge Martin and the
underpinnings of his decision regarding standing.  Rather, BP now makes several new
standing arguments (that were not originally raised in its response to Sierra Club's
motion for summary judgment).

In looking at BP's original response to Sierra Club's motion for summary judgment, BP previously advanced the following arguments, all of which Judge Martin specifically addressed and rejected: (1) "traceability should be questioned when there have been no excess emissions from the 3SPS Boilers.  Emissions of allowable levels of $PM_{10}$ . . . do not establish an injury for the purposes of standing"; (2) Plaintiff's redressability allegations are tied to a reduction in emissions but because BP has sought a change in its permit, that pending permit action defeats redressability; and (3) the general existence of other industry in the area raises "factual questions" regarding whether the Sierra Club members' injuries are fairly traceable to BP's boilers.  [DE 24 at 29-31; *see also* DE 29 at 4-6.]

BP's first standing argument in its objections is that Sierra Club has not established an injury-in-fact related to the alleged violations.  Specifically, BP claims that the injuries claimed by the Sierra Club members in their affidavits (smells, noise, flames, reduced bird populations, and general complaints about "poor air quality" attributed to the Whiting Refinery), are not related to the alleged $PM_{10}$ emissions or testing violations. [DE 30 at 4.]  BP barely alluded to this argument in its summary judgment response, asserting only that "[e]missions of allowable levels of $PM_{10}$ . . . do not establish an injury," but as Judge Martin noted in his opinion, "BP does not dispute that the emission of $PM_{10}$ at the refinery would cause or contribute to the kinds of injuries alleged."  [DE 24 at 24; DE 29 at 5.]  Even where reviewing a magistrate judge's finding de novo, "arguments not made before a magistrate judge are normally waived."

15

*United States v. Melgar*, 227 F.3d 1038, 1040 (7th Cir. 2000); *see also United States v. Moore*, 375 F.3d 580, 584 n.2 (7th Cir. 2004) (finding argument waived after objector failed to raise it before the magistrate judge); *Maxwell v. South Bend Work Release Ctr.*, No. 3:09-cv-008-PPS-CAN, 2010 WL 4318800, at *2 (N.D. Ind. Oct. 25, 2010) ("Arguments not raised before a magistrate judge and raised for the first time in the objections filed before the district judge are waived.").

Even if I address this standing argument on the merits, Judge Martin was correct when he found, based upon the three declarations of the Sierra Club members who live close to the Whiting Refinery, that "pollution from the BP refinery affects their health and the aesthetic and recreational value of the area" and therefore there is standing. [DE 29 at 5; *see* Macielewicz Aff., Marsh Aff., and Connolley Aff., DE 18-1 at 70-85.] Ms. Macielewicz lives a half mile from the refinery and when she spends time outside, she can sometimes feel a burning in her throat and on her face and the air often feels heavy. [DE 18-1 at 70-71.] When this happens, she has to retreat indoors. *Id.* Ms. Marsh also lives under a mile from the BP Whiting oil refinery, and she attests to the smell, stale air, noise, and flames coming out of the refinery. [*Id.* at 75-77.] She was recently diagnosed with chronic obstructive pulmonary disease (COPD) which she attributes to the poor air quality and PM pollution. [*Id.* at 79.] Finally, Ms. Connolley lives about 13 miles southeast of BP's Whiting Refinery. [*Id.* at 82.] Even though her home is a little further away, she still notices the poor air quality and sees ash along the lake shoreline. [*Id.* at 83.] She believes the air quality has deteriorated in the past few years. [*Id.* at 83-

84.]  All three women believe the unlawful emissions have a negative impact on the area, contribute to the pollution of Miller Beach, and want BP to be held accountable for its unlawful emissions and deterred from future violations.

It doesn't take much to show an injury in fact in the Clean Air Act context. A smidgen is enough. As the Seventh Circuit has stated, "injury-in-fact necessary for standing need not be large, an identifiable trifle will suffice." *Sierra Club v. Franklin Cty. Power of Illinois, LLC*, 546 F.3d 918, 925 (7th Cir. 2008) (citation omitted); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (quotation marks and citation omitted) ("We have held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity."). The three declarations submitted in this case more than satisfy the low threshold established by the Seventh Circuit.

To the extent BP now cites a case out of the Fifth Circuit, in support of its new argument that Sierra Club must prove standing *for each claimed violation*, not only is this an argument BP could have raised earlier but didn't, but this recent case is also nonbinding on this court and distinguishable in any event.  *See Environment Texas Citizen Lobby, Inc. v. ExxonMobil Corp.*, 968 F.3d 357, 365-66 (5th Cir. 2020).  *Environment Texas* involved a full evidentiary trial dealing with more than 16,000 violations of emission standards, and that court conceded that "[a]dmittedly, no court appears to have found standing for some Clean Air Act violations but not others, and that gives us

some pause." *Id.* at 366.  But ultimately the *Environment Texas* Court found, because there were 24 different pollutants and so many emission events, the impact of the different violations varied, and the standing inquiry was not "one-size-fits all." *Id.*  The Fifth Circuit gave the example - what if a citizen moved from Florida to a Baytown neighborhood near the Exxon complex in 2005 - that citizen would not have standing to assert violations that occurred in 2004.  *Id.* at 365-66.  Also, some of the violations included "accidents as minor as smoke caused by plugging in an extension cord and a fire in a cigarette butt can that lasted one minute." *Id.* at 366.

*Environment Texas* is a far cry from this case where I have been asked to review only 3 declarations (all from long-time Whiting residents), dealing only with the repeated emissions of one pollutant - the 0.010 lb/mmBtu $PM_{10}$ limit, during a limited amount of testing events and the associated retesting requirement.  These facts set this case apart from *Environment Texas*.  As does the more lenient standing law of the Seventh Circuit.  *See Am. Bottom Conservancy v. U.S. Army Corps of Eng'rs*, 650 F.3d 652, 658 (7th Cir. 2011) ("[I]t is enough to confer standing that [plaintiffs' aesthetic or recreational] pleasure is diminished . . . .").

BP makes another first-time argument in its objection, contending that the Sierra Club members' declarations refer to "PM" instead of "$PM_{10}$," and this somehow effects standing because BP claims "[o]nly some of $PM_{10}$ is a subset of PM." [DE 30 at 5.]  Sierra Club disputes this definition of particulate matter (or PM) [DE 32 at 4-5], but regardless, this is a ridiculous academic exercise.  The declarants are not scientific experts and it is

completely fine for them to refer to PM  instead of the more specific $PM_{10}$ which is the size of the actual emissions at issue in this case.

Emissions that do not exceed the relevant limits cannot cause injury, claims BP. [DE 30 at 6.] And that is certainly true. But Judge Martin found, and for all the reasons articulated in this opinion I agree with him, that BP *did* exceed the 0.010 lb/mmBtu $PM_{10}$ limit from its operating permit.

The next main standing argument BP lodges stems from the traceability requirement.  Let's look at the arguments BP raised during the briefing of the summary judgment first, and then I'll turn to the new arguments.  BP again contends plaintiffs' injuries are potentially attributable to other sources, or other emitters of pollution. While it is true that two of the declarants mentioned pollution from other companies in the area, Judge Martin addressed this and found that "[i]n its response, BP does not dispute that the emission of $PM_{10}$ at the refinery would cause or contribute to the kinds of injuries alleged.  Therefore, the possibility that someone else may have contributed to the alleged harm does not defeat standing." [DE 29 at 5.]  Seventh Circuit precedent reflects that plaintiffs can establish traceability by showing "that a defendant discharges a pollutant which causes *or contributes* to the kinds of injuries alleged in the specific geographic area of concern." *Texas Indep. Producers & Royalty Owners Ass'n v. EPA*, 410 F.3d 973-74 (7th Cir. 2005) (citation omitted) (emphasis added).  It has stated that "a plaintiff need not establish such a nexus with 'scientific certainty'" and that "[w]here a plaintiff has pointed to a polluting source as the seed of his injury," it is the defendant's

19

burden to provide specific evidence of any "alternative culprit." *Texas Indep. Producers*,

410 F.3d at 973-74 (quoting with approval *Friends of the Earth, Inc. v. Gaston Copper*

*Recycling, Corp.*, 204 F.3d 149, 161-62 (4th Cir. 2000)).  Here, BP has not provided any

evidence to support its speculative assertion about other emitters.  And even if some

other sources of air pollution are contributing to the Sierra Club members' harm, that

does not lessen the effect of the excess $PM_{10}$ emissions that BP is putting into the air,

which is contributing to the harm and exacerbating it.

For the first time in its objections to the Magistrate's recommendation, BP argues

that the declarations from the three Sierra Club members "do not support a finding of

traceability for the alleged injuries caused by $PM_{10}$ emissions." [DE 30 at 7.]   Because BP

did not raise this argument in front of the Magistrate, it is waived.  *See United States v.*

*Melgar*, 227 F.3d at 1040; *United States v. Moore*, 375 F.3d at 584 n.2.  But the argument is

a nonstarter anyway.  As Magistrate Judge Martin found, Sierra Club has satisfied the

test for traceability in the Seventh Circuit - where defendant "discharges a pollutant

which causes or contributes to the kinds of injuries alleged in the specific geographic

area of concern." *Texas Indep. Producers*, 410 F.3d 973-74.  Although BP contends

*Environment Texas* stands for the proposition that the harm must be traced back to the

actual boiler stacks at issue and the $PM_{10}$ emissions coming from those three stacks, as

already discussed, that case is very different from the current situation in Whiting, and

BP has cited no Seventh Circuit precedent in support of this argument.  Indeed,

*Environment Texas* acknowledged that standing is usually recognized without analyzing

each violation, citing the Supreme Court's decision in *Laidlaw*, as an example of a case where "there was no doubt that the pollutant emitted could cause the alleged injury" since the plaintiffs "asserted injuries to their aesthetic and recreational interests because the defendant's discharges polluted a river that they otherwise would have enjoyed." *Environment Texas*, 968 F.3d at 366 (citing *Laidlaw*, 528 U.S. at 183-84).

That is exactly the situation here, where BP's emissions of $PM_{10}$ have injured Sierra Club's members by diminishing their enjoyment of the outdoors in areas near the refinery. The fact that Ms. Macielewicz, who is 81 years old and lives a half mile away from the refinery, spends less time outside due to her concerns about air pollution from the Whiting Refinery and the poor air quality often prevents her from enjoying her yard, going on walks, and feeding animals outside, establishes traceability. [DE 18-1 at 70-72.] As does Ms. Connolley, who likes to bike and walk around the Miller Beach community where she lives, about 13 miles from the refinery, who is worried about the negative impacts of the particulate matter on the beach, as well as it contributing to serious health problems like respiratory illnesses. [*Id.* at 82-84.]

The last standing argument is redressability. When this motion was in front of Judge Martin, BP argued that it had proposed a revised permit, and it hoped that if the new permit was adopted, it would not have to reduce its emissions (regardless of the outcome of the lawsuit) because new emissions requirements would be in play. [DE 29 at 5.] Judge Martin found that although IDEM was apparently considering the proposal, the EPA could object to any revision adopted by the IDEM. *Id.* And because

BP presented no evidence that the EPA would necessarily agree with its interpretation of permitted emissions, Judge Martin found "the inference that a revised permit will be in force is 'speculation or conjecture,' insufficient to defeat summary judgment." [*Id.* at 6 (citing *Daza v. Indiana*, 941 F.3d 303, 308 (7th Cir. 2019)).]   Moreover, he reasoned that even if a revised permit was in place when the lawsuit ended, harm could still be redressed by other relief, like financial penalties. *Id.* (citing *Laidlaw*, 528 U.S. at 185-86 (holding that civil penalties provide "a form of redress" to citizen plaintiffs by deterring defendants from committing future violations)).

Now, in its objections, BP states that it has withdrawn that permit application, and on August 19, 2020, submitted a new application for a different modification, which IDEM has not reviewed yet. [DE 30 at 10 n.10.]   According to BP:

> While the new permit application differs in some respects from the previous permit application, the critical elements of these proposed permit revisions regarding the 3SPS Boiler Stacks remain the same. Namely, both permit applications propose the removal of the 0.010 lb/MMBtu PM10 emission rate from the Boiler Stacks, affirm that the potential to emit these stacks (not stack test results) will determine the five 3SPS Boiler Stacks' PM10 emission compliance, and result in no increase in total PM10 emissions from Refinery.

[DE 30 at 10-11 n. 10.]   During the hearing, BP's counsel crossed his fingers in the air and forecasted that IDEM would issue an amended permit soon, and that it would be favorable to BP by excluding the 0.010 lb/mmBTu $PM_{10}$ emission limit this time around.

This new permit application has the same infirmities as the first.   It is entirely speculative to say if or when a revised permit might be issued or what it might contain.

If and when the IDEM issues a draft permit, Sierra Club states it intends to review and submit comments (as it did for BP's last application attempt). [DE 32 at 10.]  Then, even if IDEM issues BP's requested permit revision, 42 U.S.C. § 7661d(b)(1) gives the EPA 45 days to object to the permit.  And if the EPA does not object, 42 U.S.C. § 7661d(b)(2) grants the public 60 days to petition the EPA to object (which Sierra Club plans to do, if necessary).  Furthermore, if the EPA refuses to object to the permit in response to that petition, Sierra Club can challenge that refusal in the Seventh Circuit.  *See id.* § 7661d(b), 7607(b).  In other words, the final outcome of this new permit application is entirely uncertain and speculative (as was the first application), and could be years in the making.  Because "[s]tanding is evaluated at the time suit is filed," *Milwaukee Police Ass'n v. Bd. of Fire & Police Comm'rs of City of Milwaukee*, 708 F.3d 921, 928 (7th Cir. 2013), these subsequent revised permit applications have no real bearing on standing in this case.  And in all events, even if a revised permit is approved and was in place by the end of this lawsuit, civil penalties can still be "recoverable for any time period in which [defendant] was found to be in violation" of previous requirements.  *Atl. States Legal Found., Inc. v. Stroh Die Casting Co.*, 116 F.3d 814, 820 (7th Cir. 1997).

BP also argues in its objections that Sierra Club has failed to establish that its members have standing for the retesting claims. [DE 30 at 22.]  Once again, this is an argument BP did not set forth before Judge Martin, and is waived.  Moreover, I can't see why the Sierra Club members wouldn't having standing for the retesting claims if I've already found they have standing for the actual emissions violations.  The whole

function of the retesting requirement is to ensure that a facility comes into compliance with the emissions requirement if it failed a test, so the Sierra Club members are injured by BP's failure to retest the facility and timely comply with the $PM_{10}$ limit.

For these many stated reasons, Magistrate Judge Martin correctly concluded that Sierra Club has established standing in this case.

### B.      The Validity (and Challengability) of EPA Testing Method 202

BP argued in front of Judge Martin, and continues to insist, that the required method to test the boiler stacks is biased.  However, Judge Martin correctly found BP's permit is "clear that for purposes of compliance, all tests 'shall be conducted' using Method 202." [DE 29 at 8 (quoting Permit Condition D.24.11(b), DE 18-1 at 30, requiring that tests be conducted in accordance with Section 326, Indiana Administrative Code 3-3); 326 IAC 3-6-5(a)(2) (requiring Method 202 for condensable particulate matter).][3]

BP contends that a "reasonable fact finder" could determine that the record contains evidence that more accurate test results (from using a different test) show that BP's actual $PM_{10}$ emissions rate does not exceed 0.010 lb/MMBtu. [DE 30 at 16.] Although BP triumphs these non-Method 202 methodologies and contends they were

---

[3] The permit requires testing in compliance with 326 IAC 3-6-5(a)(2), which explicitly requires BP to use: (1) either EPA Method 201/201A or EPA Method 5 for filterable particulate matter, and (2) EPA Method 202 for condensable particulate matter. [DE 18-1 at 30.] BP challenges the validity of testing Method 202, which is used for the testing of condensable particulate matter.

approved by IDEM[4], it seems that alternative test methods can only be used if they are approved by IDEM *and* the EPA.  The plain text of 326 IAC 3-6-5(a)(2) states that alternate procedures to measure $PM_{10}$ "may be approved by the [IDEM] and U.S. EPA," and is incorporated by reference into BP's Title V permit which specifically states that "[t]esting shall be conducted in accordance with the provisions of 326 IAC 3-6." [DE 18-1 at 30.]

BP claims only the IDEM need approve the alternative testing method, and that the language "may be approved" as opposed to stronger language like "must be approved" lends itself to a reasonable interpretation that either IDEM or EPA, or both, may approve an alternate test methodology. [DE 30 at 18.]  Other than general statutory construction caselaw, neither party cites any caselaw directly on point for the interpretation of 326 IAC 3-6-5(a)(2), and I'm not aware of any cases addressing this issue of whether the IDEM and the EPA *both* need to approve alternate procedures to measure $PM_{10}$ emissions.  Judge Martin concluded that an alternate method has to be approved by the EPA as well, and I do think this is the most straightforward reading of the statute.

But even if I read the statute to say that either IDEM or the EPA need to approve of the alternative test, BP has not presented uncontroverted evidence that the IDEM *did*

_____

[4] Sierra Club disputes that the IDEM ever approved of alternate test methodologies, citing to evidence in the record that IDEM told BP its alternate method was not acceptable, that BP knew its alternate methods could not be used to demonstrate compliance, and that IDEM directly determined that in the November 2016 tests, BP improperly used Method 8A without IDEM's approval. [DE 32 at 14 n.7; DE 1-2 at 89-90.]

approve of another method.  BP argues that tests conducted on the Boiler 32 and 36 stacks in November 2016, which used another method (Method 8A) to modify Method 202, demonstrated compliance with the 0.010 lb/mmBtu limit. [DE 30 at 17.]  BP suggests that IDEM implicitly waived an objection to Method 8A because BP submitted testing protocols using alternate test methodologies for the November 2016 stacks, and IDEM never notified BP that it denied or objected to the submitted protocols.  [*Id.*]  But this argument flies in the face of IDEM's determination that BP improperly used Method 8A without IDEM's approval on the November 1-2, 2016 tests. [DE 18 at 15; DE 1-2 at 89 (IDEM finding BP "out of compliance for PM10" where "Method 8A was conducted to test for sulfate condensable PM. . . . State rule 326 IAC 6.8-2-6 applies to the sum of filterable and condensable particulate matter.").  Moreover, to the extent BP offers the affidavit of Natalie Grimmer, who is on the Environmental Planning Team at the BP Whiting Refinery, as proof that BP "discussed" Method 8A with IDEM and the EPA, Ms. Grimmer does not state that the IDEM or the EPA actually granted BP approval to use Method 8A. [DE 30 at 17; DE 24-3 at 4.]

Judge Martin also correctly found that 42 U.S.C. § 7607 bars BP from arguing Method 202 is biased in this proceeding. [DE 29 at 9.]  He concluded that the Clean Air Act's judicial review provision states "emission requirements 'shall not be subject to judicial review in civil [] proceedings for enforcement,' such as this action." [*Id.*]  In its objection, BP tries to characterize its criticism of the testing Method 202 as a "defense" that was not really "ripe" until this lawsuit was filed. [DE 30 at 19.]  I just don't buy this

argument.  BP's permit specifically required it to use testing Method 202 for all of these years.  If BP thought that test was flawed for some reason, or that it really overstated emissions, or believed there was another more reliable test out there, it should have petitioned the IDEM and the EPA for approval to use an alternate testing methodology. BP could have applied for a modification of its permit at any time.  *See generally* 326 IAC Chapter 2.

BP has showed up at an arena for a game being played elsewhere.  In other words, this is not the appropriate venue for BP to criticize the efficacy of testing Method 202.  This is the method specifically required by BP's permit, the IDEM, and the EPA, and I am certainly not the right person to attempt to figure out the complexities of which test best measures the emissions output of an oil refinery.  That is best left to the science professionals.  If BP truly believed it had a more advanced technology that more accurately measures the outputs, then it should have petitioned the IDEM and EPA earlier to modify its permit during the more than six years BP was required to use Method 202 at these units.

*   *   *

In sum, I have conducted a lengthy de novo review of this matter, reviewing the record and the magistrate's recommendations, and made a de novo determination of the facts and legal conclusions.  I have found that Judge Martin correctly analyzed and concluded that Sierra Club's motion for partial summary judgment should be granted.

## Conclusion

Based on the foregoing reasons, I hereby ADOPT the Magistrate's Report and Recommendations [DE 29] and OVERRULE the Objections filed by Defendant, BP Products North America, Inc. [DE 30].  Plaintiff Sierra Club's Motion for Partial Summary Judgment [DE 17] is GRANTED.  BP is hereby found liable for the failure to comply with the $PM_{10}$ emissions limitation and requirement to retest as described in Counts II and III of Plaintiff's complaint as to three of the boiler stacks (numbers 503-01, 503-02, and 503-05).  Count I remains pending, and Counts II and III remain pending as to liability regarding boiler stack numbers 503-03 and 503-04.

SO ORDERED.

ENTERED: April 14, 2021.

 /s/   Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT